UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARTIN BOROIAN | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-11373-GAO |
| | ) | |
| U.S. PROBATION OFFICE | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF AMENDED COMPLAINT

_____On July 13, 2004 Martin Boroian was sentenced to one year of probation and a $100 special assessment following his conviction in the United States District Court for the District of Vermont for making a false statement in violation of 18 U.S.C. §1001(a)(2). DNA testing was not specifically ordered by the sentencing judge. Nor was authority to order such testing delegated to the Probation Office.

Mr. Boroian's probation was monitored by the United States Department of Probation in Boston, Massachusetts.[1] Mr. Boroian complied with all his probation conditions. On June 8, 2005, approximately one month before his probation was due to expire, the Probation Office ordered him to submit to a blood draw for DNA pursuant to 2004 amendments to the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), 42 U.S.C. §§ 14135-14135e. (See June 8, 2005 letter to Martin Boroian, attached as Exhibit A). In response to this letter, Mr. Boroian filed a pro se complaint in the United States District Court for the District of Massachusetts requesting that the order to provide DNA be denies, dismissed and withdrawn. See D.E.1.[2] Due

_____

[1] Mr. Boroian is a resident of Andover, Massachusetts; probation was transferred from Vermont..

[2] "D.E." refers to the docket entries in this case.

to the severe consequences of refusing the order, however, he complied with the command of the

Probation Office and submitted to the DNA testing on June 30, 2005 in Boston as scheduled.

Having finished his term of probation on July 12, 2005, more than two years ago, Mr. Boroian

now requests that his DNA profile be expunged from government databases and his DNA sample

be destroyed.

## I.    The Evolution of the DNA Act and the History of CODIS

The DNA Act requires persons convicted of specific federal "qualifying offenses" to

submit their DNA for entry into the Federal Combined DNA Index System Database ("CODIS").

42 U.S.C. § 14135a.[3]  When first passed, the DNA Act contained a narrow list of federal

"qualifying offenses" limited primarily to violent and sexual felonies.  In October, 2004 Congress

significantly expanded the Act and redefined "qualifying offenses" to include "any felony".  See

Pub. L. No. 108-405 § 203(b), codified at 42 U.S.C. § 14135a(d)(1).[4]  Pursuant to this expansion,

---

[3]  The Combined DNA Index System Database is a three-tiered system linking the National DNA Index System (NDIS), the State DNA Index System (SDIS), and the Local DNA Index System (LDIS).  All fifty states contribute DNA profiles to CODIS.  See *NDIS Participants*, available at http://www.fbi.gov/hq/lab/codis/partstates.htm (last visited March 8, 2008).  There are five different types of CODIS indices:  unidentified human remains, missing persons, forensic, convicted offender, and arrestee (if state law permits the collection of arrestee samples).  These indices may be searched against each other to find a match. See *CODIS Brochure*, available at http://www.fbi.gov/hq/lab/pdf/codisbrochure.pdf (last visited on March 8, 2008).  Currently a weekly search is conducted on the DNA profiles collected nationwide, and resulting matches are automatically returned to the laboratory that initially submitted the sample.  See *President's DNA Initiative*, available at http://www.dna.gov/uses/database/codis (last visited March 8, 2008).  As of October, 2007 CODIS contained more than five million profiles of convicted offenders and almost 195,000 profiles derived from crime scene evidence.  See *National DNA Index System Statistics*, available at http://ww.fbi.ov/hq/lab/codis/clickmap.htm (last visited March 8, 2008).

[4]  Initial federal "qualifying offenses" included murder, voluntary manslaughter, aggravated assault, sexual abuse, child abuse, kidnaping, robbery, burglary, arson and any attempt or conspiracy to commit such crimes.  With passage of the PATRIOT Act, Pub. L. No.

any person convicted of a federal felony -- even a nonviolent felony such as the false statement conviction at issue here -- must submit his or her DNA for entry into CODIS.

For individuals on supervised release, probation, or parole the Probation Office is charged with collecting a DNA sample and may use "reasonable means to detain, restrain, and collect samples from a person who refuses to give a sample voluntarily." 42 U.S.C. § 14135a (a) (4) (A). Refusal to give a DNA sample is both a violation of conditional release and a separate crime punishable by up to one year in prison and a fine of $100,000. 42 U.S.C. § 14135a (a)(5); 18 U.S.C. § 3571(b)(5). After collecting the sample, the Probation Office must furnish it to the Director of the Federal Bureau of Investigation, "who shall carry out a DNA analysis on each sample and include the results in CODIS." 42 U.S.C. § 14135(b).

## II.    The First Circuit's Analysis of the Constitutionality of the DNA Act

This case presents a constitutional issue specifically left open in United States v. Weikert, 504 F.3d 1 (1st Cir. 2007). In Weikert, the First Circuit addressed whether requiring an individual on supervised release to  provide  a blood sample to create a DNA profile and enter it into a centralized data base violated the Fourth Amendment.  Employing a "totality of the circumstances" balancing test, a majority of the panel held that an individual on supervised release had a "substantially diminished expectation of privacy", balanced that diminished expectation of privacy against the governmental interests in monitoring and rehabilitating people on supervised release, solving crimes and exonerating innocent individuals, and found no Fourth Amendment

---

107-56 § 503, 115 Stat. 272, 364 (2001), acts of terrorism and additional crimes of violence were added to the definition of federal qualifying offenses. See United States v. Kincade, 379 F.3d 813, 846 (9th Cir. 2004) (Reinhardt, J., dissenting) (detailing the history of the expansion of qualifying offenses). In October, 2004 the definition of qualifying offenses was further amended to include any federal felony.

violation. <u>Id</u>. at 11-15.[5]   The court made it clear that its holding was limited to an individual

*currently* on supervised release and specifically did not reach the question of whether it would be

constitutional to retain the DNA profile of a former offender who had completed his term of

conditional release. <u>Id</u>. at 15-18.[6]

  The <u>Weikert</u> majority cited three reasons for reserving this issue:  First, a former offender

would have a greater expectation of privacy than an offender on supervised release, warranting a

rebalancing of interests under the totality of the circumstances test; second, it suggested that the

balancing test should take into account the state of technology concerning DNA analysis and what

analysis might reveal at the time of the challenge; and finally, it suggested that because there

---

  [5] The First Circuit joined the majority of circuits in applying a "totality of the circumstances" approach to the Fourth Amendment analysis, rather than the "special needs" approach traditionally reserved for suspicionless searches and employed by the lower court and the minority of circuits.  The court reasoned that the United States Supreme Court's decision in <u>Samson v. California</u>, 126 S.Ct. 2193 (2006), was controlling.  <u>Samson</u> upheld a suspicionless search of a California parolee under the totality of the circumstances analysis.  The <u>Weikert</u> majority also noted that the search at issue under the DNA Act could not qualify as a "special needs" search because the requirement that the purpose of the search be for something beyond the normal needs of law enforcement is central to the special needs analysis.  Despite the government's arguments regarding the non-law enforcement related purposes of the DNA Act, the <u>Weikert</u> majority reasoned that law enforcement objectives were central to the DNA Act, thus the special needs analysis was inapplicable. <u>Weikert</u>, 504 F.3d at 7.  Judge Stahl dissented, stating that he would employ the special needs test and conclude that "the suspicionless search mandated by the DNA Act is an unconstitutional violation of the Fourth Amendment." 504 F.3d at 18.

  [6] In <u>United States v. Kincade</u>, Judge Gould's concurring opinion was necessary to form the plurality upholding the DNA Act as applied to a person on supervised release.  Like the <u>Weikert</u> majority, his opinion limited its scope to those currently on supervised release. <u>Kincade</u>, 379 F.3d at 841-2 (Gould, J., concurring) ("What we do not have before us is a petitioner who has fully paid his or her debt to society, who has completely served his or her term and who has left the penal system.  In that case, the special need that I identify to maintain the DNA is gone, but the record of the felon's DNA in the CODIS database is not . . . although it might seem counter-intuitive to law enforcement that a record once gleaned might be lost, there is a substantial privacy interest at stake.").

might be justifications for treating some types of former offenders differently than others, it did not "wish to make a blanket determination on the undeveloped record" currently before it. Id. at 15-16.  In Mr. Boroian's case, all three of the concerns identified in Weikert  support the conclusion that it violates the Fourth Amendment to retain his DNA sample and his DNA profile in CODIS now that his probation has ended.

**III.    Balancing Boroian's Expectation of Privacy Against Governmental Interests**

Applying a general balancing test, the government's retention of Boroian's DNA sample and inclusion of his DNA profile in a searchable database is unreasonable unless, in light of the totality of the circumstances, the legitimate governmental interests identified outweigh the resulting intrusion into Boroian's reasonable expectation of privacy in the information derived from his DNA.

    A.    Boroian's Probation Has Ended; His Expectation of Privacy is No Longer Diminished

In Weikert, the First Circuit stated that a former offender has an increased expectation of privacy which would alter the balance of privacy interests under the totality of the circumstances test:  "The distinction in status between a current and former offender clearly translates to a change in the privacy interests at stake.  A former conditional releasee's increased expectations of privacy warrants a separate balancing of that privacy interest against the government's interest in retaining his profile in CODIS."  504 F.3d at 16.  In discussing this separate balancing the court emphasized that it found the concurring and dissenting opinions in United States v. Kincade persuasive, citing portions of those opinions which noted that a former offender recovers his full Fourth Amendment rights after his term of supervised release has expired.  504 F.3d at 16 ("Once [he] completes his period of supervised release he becomes an ordinary citizen just like everyone

5

else.  Having paid his debt to society, he recovers his full Fourth Amendment rights, and police have no greater authority to invade his private sphere than anyone else's.") (quoting Kincade, at 871-872, (Kozinski, J., dissenting)); see also 504 F.3d at 15 (characterizing the question as whether DNA samples may properly be retained by the government after the felon has finished his or her term and has paid his or her debt to society.") (quoting Kincade, at 842 (Gould, J., concurring)).   Mr. Boroian's probation ended on July 12, 2005, more than two years ago; his privacy interests are no longer diminished.  Mr. Boroian has the same expectation of privacy that any individual not subject to government supervision would have in his DNA and genetic code.

     B.   Boroian's Privacy Interest in His DNA

     Martin Boroian has a privacy interest in the termination of the government's retention of his DNA and its removal from the database.  The blood draw itself and the subsequent DNA analysis was clearly a search.  See Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989) (holding that both the compelled intrusion into the body for a blood draw as well as the ensuing chemical analysis constitute searches under the Fourth Amendment). Relying on Skinner, Weikert held that Weikert's privacy interest was implicated not only by the blood draw, "but also by the creation of his DNA profile and the entry of the profile into CODIS." 504 F.3d at 12.[7] Although it did not decide the further issue, the Weikert Court suggested that a former offender who was no longer on conditional release continues to have a Fourth Amendment expectation of privacy in his DNA profile:

---

    [7] The district court also found a substantial privacy interest involved when the government retains a DNA profile, stating that "the later analysis and the identifying information that is then stored in CODIS are likely much more of an invasion of privacy than the initial blood test."  United States v. Weikert, 421 F.Supp.2d 259, 266 (D. Mass. 2006).

We acknowledge that fingerprints and other personal records are routinely
maintained in law enforcement files once taken . . . However, it may be time to
reexamine the proposition that an individual no longer has any expectation of
privacy in information seized by the government so long as the government has
seized the information lawfully . . . specifically with reference to DNA profiling,
scholars have argued that individuals do not lose their privacy interest in [ ]
information merely because the government first obtained [that information] for a
valid purpose.  Rather, courts should confront the question of whether the
prospective law enforcement use . . . satisfies the reasonableness requirement of
the Fourth Amendment . . . The argument for a continued expectation of privacy
despite the legality of an initial search is particularly deserving of separate
consideration given the wealth of information that DNA has the potential to
reveal, as well as the fact that science is continually uncovering new information
that is contained in our DNA.  We are hesitant to say that an individual has no
continued expectation of privacy in a DNA profile when our understanding of the
information that such a profile contains is necessarily incomplete.

Weikert, 504 F.3d at 16-17 (internal citations omitted).[8]

Others examining this issue have also concluded that the government's retention of the

DNA profile and its subsequent inclusion in a searchable database present unique privacy

concerns.  They counseled against an analysis which would limit the "search" at issue to the initial

physical intrusion of a blood draw:

Prior cases dealing with the level of intrusion authorized by the taking of blood
samples . . . did not confront a regime in which the samples were turned into
profiles capable of being searched time and time again throughout the course of an
individual's life . . .  The startling advance of technology has magnified the power
of the initial search authorized by the DNA Act, such that the invasion of privacy
is vastly more significant than we might have previously assumed.  Here, the
DNA placed in the CODIS database contains sensitive information, and no one

---

[8]  In this discussion the majority acknowledged that no other court has yet held that the
DNA profile of a former offender must be expunged and that the only two circuits which have
addressed the issue have held that the subsequent accessing of records stored in CODIS does not
give rise to an independent Fourth Amendment claim.  See Weikert at 17 n. 13 (discussing
Johnson v. Quander, 440 F.3d 489 (D.C. Cir. 2006) and United States v. Amerson, 482 F.3d 73
(2007)). However, the court also noted that because reasonable expectations of privacy may
change over time, "there may be a persuasive argument on different facts that the individual
retains an expectation of privacy in the future uses of her DNA profile." 504 F.3d at 17.

can say today what future uses will be made of it once it is entered into government files; certainly, today's restrictions provide no guarantees regarding future governmental uses. To reduce the search authorized by the DNA Act to the physical act of taking blood would be to ignore the "totality of the circumstances" surrounding the search and to ignore the manner in which the advance of technology has affected the degree of privacy secured to citizens by the Fourth Amendment.

Kincade, 379 at 867 (Reinhardt, J., dissenting). Similarly, another judge framed the issue as "whether the government may exploit [the probationer's] diminished Fourth Amendment rights while he is still a probationer to obtain his DNA signature so it can be used in investigating thousands of crimes nationwide, past and future, for the rest of [his] life." The issue thus framed, he noted that it was "important to recognize that the Fourth Amendment intrusion here is not primarily the taking of the blood, but seizure of the DNA fingerprint and its inclusion in a searchable database." Kincade, at 872-873 (Kozinski, J., dissenting). This Court should find that Boroian has a reasonable expectation of privacy against the continued searching of his DNA that is not surrendered simply because his DNA was first taken while he was on probation.

C.    The Government's Diminished Interests in Mr. Boroian's DNA

In contrast to Mr. Boroian's increased expectation of privacy, the government has a substantially diminished interest in Mr. Boroian's DNA now that he is no longer on probation. In Weikert, the government raised three governmental interests allegedly furthered by a regime of warrantless, suspicionless seizures of DNA: 1) the need to identify, monitor and rehabilitate individuals on supervised release, including combating recidivism through deterrence; 2) the development and maintenance of a DNA database to assist in solving past and future crimes; and 3) the capacity to exonerate innocent individuals. When balanced against Mr. Boroian's reasonable expectation of privacy, those interests do not justify the retention and subsequent

searching of Mr. Boroian's DNA.

        1.      <u>The Government's Interest in Rehabilitating Probationers and Preventing Recidivism</u>

In <u>Weikert</u>, the government cited a need to "identify,[9] monitor, and rehabilitate individuals on supervised release" and the closely related interest of "preventing recidivism" as its primary interests. <u>Weikert</u>, at 13.   The court agreed, noting that "[t]he interest in combating recidivism is the very premise behind the system of close parole supervision." <u>Id</u>.   Other courts have upheld the DNA Act on the theory that the Act serves the legitimate purpose of monitoring probationers to ensure that they do not commit further crimes.   See <u>Kincade</u>, 379 F.3d at 838 ("By establishing a means of identification that can be used to link conditional releases to crime committed while they are at large, compulsory DNA profiling serves society's overwhelming interest in ensuring that a parolee complies with the requirements of his release and is returned to prison if he fails to do so.").   In Mr. Boroian's case, the governmental interest in ensuring that he complies with the requirements of his probation is no longer relevant - he has already completed his probation without incident.

The government may also argue that its interest in preventing recidivism and deterring the

---

[9]  The claim that DNA profiles are relevant for the purpose of "identifying" an individual on conditional release is specious.  Boroian, for instance, was identified and his identification was confirmed by a criminal conviction before a court of law, long before his DNA sample was taken. Indeed, his DNA sample was not taken until his probation had almost expired.  Fingerprint cases have long recognized a distinction between fingerprints taken from "free persons to determine their guilt of an unsolved criminal offense and the gathering of fingerprints for identification purposes from persons within the lawful custody of the state."  <u>Kincade</u>, 379 F.3d at 836.  "The collection of a DNA sample does not 'identify' the conditional releasee any more than a search of his home does - it merely collects more and more information about that releasee that can be used to investigate unsolved past or future crimes."  <u>Kincade</u>, 379 F.3d at 857 (Reinhardt, J., dissenting).

individual is not confined to the time an individual is on probation and is furthered by the retention of DNA  Weikert, 504 F.3d at 13-14.  However, this requires examining the likelihood of recidivism.  As Weikert suggested, one size does not fit all.  There may be reasons to treat some types of former offenders differently than others.  Weikert, 504 F.3d at 15-16.  For example, there may be a greater justification to retain the DNA of violent felons or sex offenders than the DNA of non-violent felons, felons who are not likely to recidivate, or felons whose crimes, if repeated, are not likely to leave any DNA traces at the crime scene.

In this case, the government's general interest in preventing future recidivism and specific deterrence does not justify retaining Mr. Boroian's DNA.  Boroian was convicted of making false statements, a non-violent felony.  Even if repeated, this is not the type of crime for which DNA evidence is generally relevant.

Nor is Mr. Boroian the type of offender likely to recidivate.  Prior to this conviction Mr. Boroian had no criminal history or history of violence.  Studies by the United States Sentencing Commission show that a non-violent offender with no prior criminal history is statistically the least likely offender to recidivate.[10]  They also show that Category I offenders with fraud as the primary sentencing guideline are also in the least likely to recidivate category.[11]  Mr. Boroian is more than 50 years old.  The Sentencing Commission has also determined that recidivism rates decline consistently as age increases.  Offenders over 50 years old have the lowest recidivism rate

---

[10]  See United States Sentencing Commission, *Recidivism and the First Offender* at 19 (May, 2004), available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf (last visited March 8, 2008)

[11]  See United States Sentencing Commission, *Measuring Recidivism, the Criminal History Computation of The Federal Sentencing Guidelines*, at 30, available at http://www.ussc.gov/publicat/Recidivism_General.pdf (last visited March 8, 2008).

10

of all offenders age groups studied.[12]

The facts of Mr. Boroian's sentencing and history on probation further support the conclusion that he is a low-risk offender. The judge imposed no incarceration,[13] sentencing Boroian to a one year term of probation and a $100 special assessment.[14] In addition, the Court specifically noted on the judgment that Mr. Boroian presented "a low risk of substance abuse" and suspended the requirement that he participate in drug testing while under supervision. Boroian complied with all conditions of probation. Even in the face of a potentially unconstitutional request from the Probation Office to submit to DNA testing, Mr. Boroian acted in a law abiding manner by submitting to the Probation Department's order while seeking to safeguard his Fourth Amendment rights through litigation.

In light of the non-violent nature of his crime, the likelihood that this type of crime would not leave any forensic evidence, and Mr. Boroian's statistically low risk of recidivism, supported by both his criminal history and his subsequent behavior while on probation, retaining his DNA sample or his profile would not further the government's goal of deterrence or preventing recidivism.

---

[12] See United States Sentencing Commission, *Measuring Recidivism, the Criminal History Computation of The Federal Sentencing Guidelines*, at 14, available at http://www.ussc.gov/publicat/Recidivism_General.pdf (last visited March 8, 2008).

[13] Mr. Boroian's guideline sentencing range was 0 to 6 months.

[14] The United States Sentencing Commission has also found that offenders serving a sentence of probation were the least likely to recidivate of the offenders studied. *Measuring Recidivism*, supra at 13.

2.    The Government's Law Enforcement Interest

In Mr. Boroian's case there is no governmental interest served in retaining his DNA other than a general governmental interest in efficient crime control:  The government wishes to use his Mr. Boroian's DNA profile for the purpose of investigating crimes nationwide, past and future, for the rest of his life.  Although general crime control is a valid interest, and a larger database may be more efficient, enhancing crime control cannot override Mr. Boroian's serious privacy concerns in this case.  Mr. Boroian's DNA was obtained in the context of a suspicionless search while he was a probationer.  The special reasons which merited the seizure of his DNA - to monitor him while on probation - have now ended.  The remaining governmental justification for retaining his DNA is not sufficient to overcome his Fourth Amendment right to privacy in the protection of his genetic code.  See United States v. Stewart, 468 F.Supp.2d 261, 273 (D. Mass. 2007) (stating that a court should not attribute much weight to the general crime control objective "when operating in the context of a suspect class of suspicionless and warrantless searches."). See also City of Indianapolis v. Edmond, 531 U.S. 32, 41 (2000) (noting that the Court had "never approved [a general program of suspicionless seizures] whose primary purpose was to detect evidence of ordinary criminal wrongdoing".); Kincade, supra, 379 F.3d at 872 ("authorizing the extraction of his DNA now to help solve crime later is a huge end run around the Fourth Amendment." (Kozinski, J., dissenting)).  Therefore, retaining Mr. Boroian's DNA is a violation of the Fourth Amendment.

D.    The Unique Privacy Interests Implicated by DNA

DNA's unique character presents privacy concerns that make it unlike other forms of identification, such as fingerprinting or photographing.  While a fingerprint discloses nothing

about a person other than his identity, DNA has the potential to reveal a wealth of medical and

genetic information about a person's race, sex, genetic defects, or predispositions to diseases.

United States v. Stewart, 486 F.Supp.2d 261, 264 (2007).  It is this unique ability to reveal genetic

traits that makes DNA retention so potentially intrusive to individual privacy.  In addition, the

limits to what DNA can reveal about an individual are not currently known.  Research is ongoing

in all areas, including the area of "behavioral genetics" which seeks to identify specific genetic

traits that cause or predict antisocial behavior and mental illness.[15]  "DNA stores and reveals

massive amounts of personal, private data . . . and the advance of science promises to make stored

DNA only more revealing in time." Kincade, 379 F.3d at 842 n. 3 (Gould, J., concurring).

     1.    DNA as a "Genetic Identifier"

DNA, or deoxyribonucleic acid, is the genetic material found in the chromosomes of most

human cells.  Each DNA molecule consists of two strands, known as a double helix, containing a

particular sequences of nucleic acids.  Although most of the human genome consists of genetic

information shared by the majority of the population, each individual's chromosomes have minute

variations known as polymorphisms that serve as unique identifiers.  By isolating those areas of

the chromosome known to be unique to each individual, forensic DNA testing can compare two

samples to determine if the genetic mutations "match", or contain DNA from the same individual.

_____

    [15]  See Elizabeth Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy,* 100 Nw. U. L. Rev. 857, 876-877 (2006) (discussing the potential of genetic research to determine behavioral traits); Jonathan Kimmelman, *Risking Ethical Insolvency: A Survey of Trends In Criminal DNA Databank-ing,* 28 J.L. Med & Ethics 209, 212 (2000) (noting that the pool of banked criminal DNA "might also provide an epidemiological resource for behavioral geneticists to assess the frequency of a particular genetic allele among offender sub-populations (e.g. pedophiles, sexual offenders, or violent felons)"; also noting that at least one elected official has publicly advocated such a use and that the Program Manager of the FBI's Federal Convicted Offender DNA Program has refused to rule out such a possibility.)

In the United States, forensic DNA profiling is accomplished by examining thirteen loci (locations on the human genome) known as single tandem repeats, or "STR"s.  At each of these thirteen locations, people have two "alleles", repeating sequences of DNA base pairs (one maternally inherited, the other paternally inherited).  The numbers of repeats at these locations vary from individual to individual.  Thus, a forensic DNA profile is simply thirteen pairs of numbers - a list of the numbers of repeats found in each of the two alleles for each locus. A match at all thirteen loci (producing thirteen pairs of numbers) is generally considered to be a statistically unique identifier. [16]

2.      The Fallacy of "Junk DNA"

Supporters of DNA databases have often argued that the DNA used in the CODIS database is "junk DNA" - DNA that does not code for any particular genetic trait (also called "non-coding" DNA).  Cole, supra, at 56.   They thus minimize privacy concerns, arguing that the data derived from testing at these locations can only be used for identification of a person, and not to derive any additional genetic information about a person beyond identity.  The DNA Act itself was premised on the idea that the DNA at the thirteen CODIS locations does not contain any medically significant information:  See H.R.Rep. No. 106-900(I) at *27 ("the genetic markers used for forensic DNA testing were purposely selected because they are not associated with any known physical or medical characteristics . . . In common parlance, they show only the configuration of DNA at selected "junk sites" which do not control or influence the expression of

---

[16] See Simon A. Cole, *Is the "Junk" DNA Designation Bunk?* 102 Nw. Univ. L. Rev. Colloquy 54, 56 (2007).

any trait."). In upholding the DNA Act, some courts have relied on this argument.[17]

However, the notion that junk DNA contains no genetic information other than a genetic identifier

is now disputed. See Kincade, 379 F.3d at 850 (Reinhardt, J., dissenting) (noting that this

understanding of junk DNA has been disputed for some time and citing articles). Non-coding

DNA comprises approximately 98% of the human genome: Only 2% of the human genome

actually codes for proteins. Now that the entire human genome has been mapped and is being

studied, many of the "junk DNA" markers once thought to be meaningless have been found to

contain predictive medical information. Thus, science is continually uncovering new information

contained in our DNA. Weikert, 504 F.3d at 17.

> The extent of this unseen genome is not yet clear, but at least two layers of
> information exist outside the traditionally recognized genes. One layer is woven
> throughout the vast "noncoding" sequences of DNA that interrupt and separate
> genes. Though long ago written off as irrelevant because they yield no proteins,
> many of these sections have been preserved mostly intact through millions of years
> of evolution. That suggests they do something indispensable. And indeed a large
> number are transcribed into varieties of RNA that perform a much wider range of
> functions than biologists had imagined possible. Some scientists now suspect that
> much of what makes one person, and one species, different from the next are
> variations in the gems hidden within our "junk" DNA

---

[17]  See e.g. Kincade, 379 F.3d at 831 ("the DNA profile obtained from the defendant's
blood sample establishes only a record of the defendant's identity . . ."); United States v.
Amerson, 483 F.3d 73, 76 (2d Cir. 2007) ("sequences of Junk DNA were purposely selected
because they are not associated with any known physical or medical characteristics."). However,
the First Circuit noted in Weikert that neither the DNA Act itself nor the Attorney General's
regulations implementing the Act mandate the exclusive use of "junk DNA". Rather, "the DNA
Act includes a broad authorization, id § 14135a(a)(1)(A) & (B), to perform "analysis of the
deoxyribonucleic acid (DNA) identification information on a bodily sample, id § 14135a(c)(2).
None of our sister circuits has noted this omission." Weikert 504 F.3d at 13 n. 10. The Weikert
court emphasized that "evidence that the DNA analysis procedure has been changed to include
non-junk DNA-either officially or unofficially would require a reconsideration of our Fourth
Amendment analysis." Id.

See W. Wayt Gibbs, *The Unseen Genome: Gems Among the Junk*, Sci. Am. Nov. 2003 at 46.[18]

Although the genes at the thirteen CODIS loci themselves have not yet been found to cause any physical traits or diseases, some scientists and commentators have suggested that they may be medically useful because, although they do not *cause* traits or diseases, they do *correlate* with them and therefore have medical significance.  See Cole supra, at 59. ("even though the forensic STRs don't as far as we know cause disease, they correlate with the genes (or assortments of genes) that do, and thus may be useful for tracking which individuals have the disease causing genes . . . it is misleading to claim that forensic STRs have no medical significance, are devoid of information, or are completely innocuous from a privacy standpoint.").

Even with the current state of knowledge we know that the CODIS STRs do not function

---

[18] See also Justin Gillis, *Genetic Code of Mouse Published; Comparison With Human Genome Indicates "Junk DNA" May Be Vital*, Washington Post, Dec. 5, 2002 at A1 (noting that studies in 2002 reveal that junk DNA contains valuable information about how the body uses genes and that the "instruction set [contained within junk DNA] is at least as big as the gene set, and probably bigger."); Clive Cookson, *Regulatory Genes Found in "Junk DNA"*, Fin. Times, June 4, 2004 at 11 ("Molecular biologists are beginning to find that the long stretches of the genome previously dismissed as a genetic wasteland or "junk DNA' actually perform some important functions.").

solely as unique identifiers.  They also correlate to both race[19] and  kinship.[20]  Because the genes

at the thirteen loci can predict kinship, the reach of the DNA database search can be expanded to

cover individuals who are not currently in the database and who have never been convicted of any

crime.  Indeed, this is already occurring:  FBI regulations previously prohibited releasing partial

CODIS matches.  However, some in law enforcement advocated for such release as a useful tool

for law enforcement to link crime scene forensic profiles to the relatives of perpetrators. See CBS

News, *A Not So Perfect Match: How Near DNA Matches Can Incriminate Relatives of Criminals*,

attached hereto as Exhibit B. Acceding to this argument, the FBI recently issued an interim plan

for the release of partial match profiles.  See *Interim Plan for Release of Information in the Event

of a "Partial Match" at NDIS*, CODIS Bulletin, July 20, 2006, attached as Exhibit C. See also

American Prosecutor's Research Institute, *Catching Criminals By Investigating Profiles With

Allelic Similarities*, 10 Silent Witness 2 (2006), attached as Exhibit D. The release of partial

matches from the CODIS database gives law enforcement the ability to find suspects genetically

similar to an individual whose profile is already contained in the CODIS database, further

---

[19]  Phenotypic profiling, the prediction of the "race" of an unknown perpetrator, is already being used in criminal investigations.  See Pilar N. Ossorio, *About Face: Forensic Genetic Testing for Race and Visible Traits*, 34 J.L.Med & Ethics 277 (2006) (describing instances of genetic analyses of crime scene samples to generate descriptions of a suspect's physical appearance and race).  Furthermore, the United States Department of Justice predicts that by the year 2010 "there should be a number of markers available that identify physical traits of the individual contributing the DNA.  It should be possible, using this information, to narrow the search for a suspect, with consequent increases in accuracy and efficiency of operation." National Institute of Justice, *The Future of Forensic DNA Testing: Predictions of the Research and Development Working Group*, at 3-4 (2000), available at http://www.ncjrs.gov/pdffiles1/nij/183697.pdf  (last visited March 7, 2008).

[20]  See Henry T. Greeley, et al., *Family Ties: The Use of DNA Offender Databases To Catch Offender's Kin*, 34 J.L. Med & Ethics 248 (2006).

implicating privacy interests.

Thus, the DNA profiles within CODIS are *already* being put to uses which were not envisioned or authorized by the initial legislation, and that have far reaching implications for privacy. Additionally, use of the DNA databank in this way is directly contrary to the argument, advanced by the United States in support of the DNA Act, that the Act serves a legitimate governmental interest because it "protects 'innocent individuals - whose DNA does not match the DNA collected at the crime scene - *from even becoming potential suspects*.'" Weikert, 504 F.3d at 14, quoting United States v. Amerson, 483 F.3d at 88 (emphasis added). See also Kincade, 379 F.3d at 839 n. 38 ("CODIS promptly clears thousands of potential suspects - thereby preventing them from ever being put in that position"). Instead, this use of the DNA database may make numerous innocent individuals suspects in any given crime. Assuming the DNA database produced a partial match to a suspect's DNA left at a crime scene, all of the people who were partial matches to that DNA would potentially be suspect. The increasing use of CODIS for partial-match searches will also inevitably lead to pressure to increase the number of genetic markers analyzed for forensic DNA typing to increase the probability of identifying true genetic family relationships with confidence. See Greeley, supra, at 254 ("The more markers analyzed, the lower the probability that a partial match is the result of chance rather than family ties. If a thousand STRs similar to the CODIS markers were analyzed for both offenders and crime scene DNA, the probability that an unrelated person would match an offender at fifty percent of those markers would be very small . . ."). Because, as discussed above, more and more DNA markers formerly thought of as "junk" are now thought to contain predictive medical information, increasing the number of DNA markers in forensic DNA testing further invades individual

privacy.

Moreover, the FBI encourages all laboratories to retain portions of the evidence samples they collect.[21] This affords the government the opportunity to re-test and reanalyze a virtually limitless number of samples as science progresses. Kincade, at 850 (Reinhardt, J., dissenting).[22] As partial-match testing becomes more commonplace, there thus may be increased pressure on law enforcement to re-test DNA in the database to obtain additional STR markers for forensic analysis.

## IV.     EXPANSIONS OF CODIS AND THE SLIPPERY SLOPE

The cases that have upheld the DNA Act against Fourth Amendment challenge from inmates and persons on conditional release have cited the principal of deciding constitutional cases narrowly, and discounted the arguments of the dissent warning against potential future expansions of the DNA database. See, e.g. Kincade 379 F.3d at 838. ("Our job is limited to resolving the constitutionality of the program before us . . . if, as Kincade's aligned amici and Judge Reinhardt's dissent insist, and when, some future program permits the parade of horribles the DNA Act's opponents fear . . . we have every confidence that courts will respond appropriately.)

This approach runs the risk of gradually eroding privacy protections. These protections

---

[21] See Federal Bureau of Investigation, *Standards for Forensic DNA Testing Labs* at ¶ 7.2, available http://www.fbi.gov/hq/lab/codis/forensic.htm (last visited March 8, 2008).

[22] Although the federal government currently prohibits any use other than identification, some state DNA collection statutes already authorize other uses of collected DNA profiles such as to support "identification research and protocol development" or to assist medical research See *Jonathan Kimmelman, Risking Ethical Insolvency: A Survey of Trends In Criminal DNA Databank-Ing*, 28 J.L. Med & Ethics 209, 212, 220 (2000) (collecting statues).

remain vital only as long as society objectively recognizes a personal, subjective expectation of privacy as reasonable.  See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  An individual will lose his Fourth Amendment protections if information becomes so  pervasively available to the public that objectively one could not expect to exclude others from accessing such data.[23]

The potential loss of privacy is even more threatening because of  the ease with which DNA information can be stored and accessed:  "In our age in which databases can be "mined" in a millisecond using super-fast computers, in which extensive information can, or potentially could, be gleaned from DNA (even the "junk" DNA currently used), and in which this data can easily be stored and shared by governments and private parties worldwide, the threat of a loss of privacy is real, even if we cannot yet discern the full scope of the problem."  Kincade, 379 F.3d at 842.  Our nation's history is replete with examples of databases that expanded despite their initial discrete purposes.[24]  CODIS itself has already expanded significantly, both in the type of offender required to provide DNA and in number of states that require DNA collection.  In addition, CODIS now threatens to expand its reach to arrestees,[25] and even individuals who have never

———————————

[23]  For example, the great expansion in fingerprinting came before the modern era of Fourth Amendment jurisprudence ushered in by Katz v. United States, and proceeded unchecked by any judicial balancing against the personal right to privacy.  As a consequence, society has become accustomed to the idea of fingerprints being stored in a government database.  Kincade, 379 F.3d at 874 (Kozinski, J., dissenting).

[24]  See Stewart, 486 F.Supp.2d at 281 (describing the history of the social security program, the government's use of census records collected for general statistical purposes to aid in the Japanese internment program during World War II, and governmental data mining programs "Operation Minaret", "Operation Shamrock", and "Basic Pilot").

[25]  The DNA Fingerprint Act of 2005 authorized the collection of DNA samples of persons' *arrested or detained* under federal authority for inclusion in CODIS. See Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162 §

been accused of any crime.[26]  Some scholars currently advocate extending CODIS to cover entire

populations.[27] The lesson that history teaches us from these experiences is that privacy erodes first

at the margins, and "privacy protection must always begin at the front door." Stewart, 468

F.Supp.2d at 280.

## V.    CONCLUSION

Martin Boroian was convicted of making a false statement.  He has paid his debt to society

by serving a year of probation for that offense.  His probation has now expired.  Yet Boroian, by

terms of the DNA Act, will effectively be subject to government intrusion into his privacy for the

rest of his life.  Every time new evidence is discovered from a crime scene, the government will

search Boroian's genetic code to determine whether he has committed the crime notwithstanding

the absence of any cause to suspect him.  Moreover, the retention of his DNA will permit a myriad

of other known and unknown uses of the samples by governmental authorities as technology

evolves.  The scope and number of the future privacy intrusions on Mr. Boroian are virtually

limitless because his DNA will be kept permanently and searched repeatedly.  Any interest the

Government may have in law enforcement cannot outweigh Mr. Boroian's privacy interests.

---

1004, 119 Stat. 2960, 3085, codified as amended 42 U.S.C. §14135a.  No case has yet challenged
the constitutionality of this provision.  In addition, several states have passed laws authorizing
them to sample an individual's DNA upon arrest.

[26] For example, CODIS now also includes DNA profiles of members of the armed forces,
despite the fact that the army's DNA repository was originally promised to be used only for the
identification of human remains.  Kincade, 379 F.3d at 858-859.

[27] See e.g. D.H. Kaye & Michael E. Smith, *DNA Identification Databases: Legality,
Legitimacy, and the Case for Population-Wide Coverage*, 2003 Wis. L. Rev. 413 (2003).

Accordingly, Mr. Boroian respectfully requests that this Honorable Court order his DNA sample destroyed and his DNA be expunged from CODIS and NDIS.

Respectfully submitted,

MARTIN BOROIAN
By his attorney,

/s/ Judith Mizner
Judith Mizner
B.B.O. #350160
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

March 11, 2008.

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 11, 2008.

/s/ Judith Mizner
Judith Mizner

# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### Probation Office

**JOHN M. BOCON**
Chief U.S. Probation Officer

499 Essex Street, 2nd Floor
Lawrence, MA 01840-1269
(978) 689-3653
Fax - (978) 689-9067

June 8, 2005

Martin Boroian
121 North Main St.
Andover, MA 01810



### <u>NOTICE OF SCHEDULED APPOINTMENT FOR DNA TESTING</u>

Dear Mr. Boroian:

You were recently notified of legislation which was passed regarding Section 203 of Public Law 108-405 that amends 42 U.S.C. § 14135a (d) (1) and 10 U.S.C. 1565 (d) to expand the list of qualifying federal and military offenses that trigger the collection of a DNA sample from federal and military offenders. In accordance with that notification, you are hereby instructed to report for submission of DNA on:

<u>Date/Time:</u>    Thursday, June 30, 2005 @ 2:30 p.m.

<u>Location:</u>    John Foster Williams Building
408 Atlantic Avenue, 4th Floor
Boston, MA 02210
(617) 748-9188

Please be advised that the DNA testing protocol involves the drawing of a blood sample by a registered nurse as well as fingerprinting by a member of the U.S. Probation Office. Failure to comply with this directive may result in adverse action.

Directions to the Williams Building are enclosed. Should you have any questions, please contact me at (978)687-2796.

Sincerely,

Carmen P. Wallace
U.S. Probation Officer

CPW/jh

Enclosure

# Exhibit B


**CBS NEWS**

⟩ BACK    ⟩ PRINT

# A Not So Perfect Match

**July 15, 2007**

**(CBS)** *This segment was originally broadcast on April 1, 2007. It was updated on July 15, 2007.*

There's a new saying in law enforcement circles these days: don't do the crime if your brother's doing time. And the reason for that is the power of DNA.

As **60 Minutes correspondent Lesley Stahl** reports, every state in this country collects DNA from convicted felons and loads it into computer databases, all linked together by the FBI. When detectives find DNA at a crime scene, they run it through that database looking for a perfect match. You see this on crime shows all the time.

But sometimes a search yields a not so perfect match but a partial match, in which case it's clear that the felon in the database did not commit the crime. But the DNA is so similar, maybe their father, mother, or brother did.

This raises a dilemma: should police start investigating those family members, or is that going too far?

"These are important scientific leads that need to be run down. And the fact that we can't run them down in this country I think is shameful," says Mitch Morrissey, the district attorney of Denver, Colo.

Morrissey runs one of the most aggressive cold case projects in the country. On three separate occasions over the last few years, his team ran DNA from unsolved rapes through the DNA database and came up with partial hits.

In these three cases, Morrissey says there wasn't a perfect match, but that the matches were very close.

Morrissey wanted the names of those felons, so he could investigate their family members, but he was told that FBI policy prohibits states from sharing names with one another unless it's a perfect match.

"This isn't car break-ins. These are the type of people that will attack women. And continually do it until you catch them. And I think that the FBI, my office, the Denver Police Department, owe it to victims, and potential victims to run down these leads," Morrissey argues.

**60 Minutes** asked Angelo Della Manna, head of DNA analysis for the state of Alabama, for a crash course in how DNA profiles and matches work.

He showed Stahl the DNA profile of one individual. In a visual profile, one can see 13 pairs of peaks, or "alleles," which are then represented as numbers. One number in each pair comes from the mother; one from the father.

"When you look at this, can you tell me what color eyes that person has, or how tall they are? Or anything like that?" Stahl asks.

"No, not at all," Della Manna says. "The areas that we look at are commonly referred to as in the junk DNA."

When Della Manna runs a sample from a crime scene through the DNA database and gets a perfect match, the numbers are identical in both profiles. But sometimes he gets a partial match, where all but a few numbers are the same.

"These partial matches kind of hit you between the eyes and you say, 'Well, it's obviously not this person.' But when you look at the profile as a whole, there's a lot of sharing there," he explains. "Statistically, there's a strong likelihood that you're looking at the biological relative of the rapist or the source of this crime scene sample."

Criminologists have long known that crime tends to run in families: one study found that 51 percent of inmates in state prisons had a family member who had also been incarcerated. In fact, a statistical analysis last year in the journal "Science" found that if we used our DNA database to deliberately look for family members, it could yield 40 percent more hits.

"Now you're subjecting a whole new class of innocent people to genetic surveillance by the government," argues Stephen Mercer, a Maryland attorney who specializes in issues involving DNA.

"With this new technology, no one has ever considered, 'Well, if my brother's DNA ends up in the database, and he's forfeited his privacy rights by becoming a convicted felon, has he also forfeited my privacy rights, as well, as a wholly innocent family member,'" Mercer says. "That puts me under lifelong genetic surveillance."

Speaking with D.A. Morrissey, Stahl points out, "The other side of the argument is that this is genetic surveillance and that it invades innocent people's privacy. And that this is America and we don't do that."

"Let me give you an example. Say we have a hit and run accident where someone was killed. And we have witnesses that say, 'This is the color of the car. This is the style of the car. But I only got the first three license plate numbers' … Only a partial. What should the police do? Just say, 'Oh no, it's only partial, so we're not gonna do anything.' Or should they go to your motor vehicle database and they may talk to 20 people that weren't involved in the accident at all. And I'll tell ya, most of those people are gonna tell ya, 'Thanks for looking into this. Because we hope you solve the case,'" Morrissey says.

But Stephen Mercer disagrees. "Of course they're gonna come up with analogies that seem to do away with any sense of wrongdoing or any sense of violation of privacy by the government. So, they say, 'Oh, well this is like a partial plate, and we're just following up on these leads….," he says.

"And what's wrong with that?" Stahl asks.

"Because it's not a partial plate. We're talking about DNA. DNA is different. DNA contains a vast amount of intensely personal information," Mercer says.

And he says there are serious racial implications, because since blacks are overrepresented in the prisons, and therefore in the DNA database, extending it to relatives would magnify the disparity.

"What you're gonna end up seeing is nearly the majority of the African American population being under genetic surveillance," Mercer says. "If you do the math, that's where you end up."

"Extremely specific question. You have a crime lab looking at DNA in a horrific crime. They get a partial match, a very close match, and the DNA expert suspects a brother. Should he withhold that information from the police, or should he tell the police, 'We think a brother did this?'" Stahl asks Mercer.

"If it comes from a database search?" Mercer asks.

"Yes," she replies.

"Then it should not be revealed," Mercer says.

"So, the DNA expert should just say, 'Sorry. No match.' And that's the end of it? And not pass this incredible clue along?" Stahl asks.

"That's correct," Mercer argues.

Mitch Morrissey says he has a big problem with that. "They have this information. And they're not telling the lead investigators? How do they justify that to the next victim of this serial rapist?" he asks.

Morrissey thinks the U.S. should do what the British are doing: they have developed a technique to scour their DNA database, deliberately searching for partial matches that might indicate a relative.

It's called "familial searching," and the city of Rotherham used it to try and catch a criminal who had eluded police for 20 years. Back in the 1980s he was called the "shoe rapist," because of the pattern of his attacks.

"It was a lone female walking home. Invariably they were wearing stiletto shoes. They were tied up using stockings, and their shoes were always stolen," explains Det. Sue Hickman.

Hickman was given a list of 43 people in the area who could have been related to the rapist. The third door she knocked on belonged to June Lloyd, whose DNA was in the database because of a DUI arrest.

What did she say to her?

"'We're running a cold case investigation and there are some similarities between your DNA and the offender's DNA. Do you mind telling me, have you got any brothers?' And, she said, 'Yes.' She said, 'I've got a brother, but it wouldn't be my brother. He's a businessman,'" Hickman remembers.

Her brother James was a manager at a print shop. Married, with children, he had no criminal record. But when his sister called and told him about Hickman's visit, he became suicidal, and his family called the police.

Underneath a trap door at his office, police discovered more than 100 women's shoes, all worn, all different sizes, all stiletto heels. DNA testing confirmed James Lloyd was the "shoe rapist."

Hickman had visited three people and solved the crime in eight hours.

Mitch Morrissey believes familial searching should become national policy. "There should be a familial searching policy that is constitutional and legal in the United States," he tells Stahl.

Darryl Hunt in Winston-Salem, N.C., would agree, and not just for its potential to catch criminals, but for its power to set innocent people free.

Twenty-three years ago, Winston-Salem was shaken by a brutal killing: a young newspaper editor named Deborah Sykes was dragged to a grassy area, raped and stabbed 16 times. Although there was little to go on, Darryl Hunt was charged with first degree murder.

Investigators had no fingerprint and no blood, but they did have semen, which Hunt tells Stahl didn't match him.

The semen didn't match his blood type – and yet, Hunt was convicted and sentenced to life. Ten years later, when DNA testing came along, it showed he was not the rapist. But to Hunt's astonishment, the judge said he still could have committed the murder, and sent him right back to prison.

He spent another nine years behind bars before the state ran the DNA from the crime scene through North Carolina's database. That's when things got interesting.

They got what seemed to be a hit to a convicted felon named Anthony Brown, but the sample was so old, it was degraded and the result inconclusive, so they flew the sample to Angelo Della Manna's state-of-the-art lab in Alabama, which produced a clear profile that revealed that Anthony Brown was not the rapist.

But the profile was remarkably close and led Della Manna to wonder if Brown had a brother.

He told his counterparts in North Carolina that they might want to check and see if Anthony Brown had any brothers. FBI policy doesn't prohibit a state from pursuing a partial match within its own borders. What he heard back the next day was not what he expected.

"He has 11 brothers," Della Manna remembers. "Six of those brothers were deceased. However, there was one brother who was in a neighboring county on a misdemeanor parole violation."

The investigators' next move was right out of CSI. "They offered him a cigarette. He took that cigarette and then finished the interview. And they took that cigarette butt to the laboratory, ran that very quickly. And it matched at all 13. And then that generated the arrest warrant," Della Manna explains.

The man who actually raped and murdered Deborah Sykes was Anthony Brown's older brother, Willard. Confronted with the DNA evidence, he confessed. And Darryl Hunt, after 19 years, was finally set free.

But to some, even a wonderful end can't justify the means.

"If the measure of reasonableness is going to be, 'We got the right guy,' then every search is gonna be reasonable," says Stephen Mercer. "In the name of solving crimes, let's just start going around and kicking down doors. And issuing general search warrant for high crime neighborhoods and randomly searching and seizing people. Cause you know what? We're gonna solve a lot of crime. No doubt that will be a benefit. But, what's the cost?"

"I know that there's people that talk about privacy rights and this, but I think of two things: one is the victims," says Darryl Hunt. "There'll be more victims if this person is not caught. And the other is the person that could be falsely accused and sitting in prison."

The city of Winston-Salem offered Hunt an apology and $1.65 million to compensate him for his years in prison. From his office overlooking the old county courthouse, he now works to help other former inmates re-enter society. And he's thankful that North Carolina isn't a state where a partial DNA match can't be pursued.

"If it wasn't for this then I wouldn't be here," he says.

After months of pushing, Denver D.A. Mitch Morrissey won a partial victory: the FBI has instituted an interim policy that leaves it up to the states to decide whether to share information with one another in the event of a partial match. He's hoping that'll help solve his three rape cases.

Produced By Shari Finkelstein

© MMVII, CBS Interactive Inc. All Rights Reserved.

# Exhibit C

 **CODIS Bulletin**

---

Bulletin #: BT072006                                    Date Distributed: 07/20/06

## Interim Plan for the Release of Information In the Event of a "Partial Match" at NDIS

Although an exceptional event, the CODIS Unit is aware that there may be certain circumstances when NDIS Participating Laboratories encounter a candidate match that could be classified as a "partial match."

For purposes of this Bulletin and Interim Plan, a "partial match" is a moderate stringency candidate match between two single source profiles having at each locus at least one allele in common. A "partial match" is a match of two profiles that cannot be confirmed. A "partial match" is not an exact match of two profiles customarily used to infer the identity of the perpetrator. A potential familial relationship may exist between the offender and the putative perpetrator.

For candidate matches occurring at the national level, current NDIS Procedures prohibit the release of the offender's personally identifiable information under these circumstances ["partial match"]. For situations in which there is no other available investigative information, the FBI Laboratory has instituted an Interim Plan that may permit the release of the offender's identifying information.

The Interim Plan for the release of information to an NDIS Participating Laboratory is as follows:

1. With the documented concurrence of the prosecutor, the Casework Laboratory that identifies a "partial match" shall provide the NDIS Custodian with a written request for the release of the offender's identifying information. Such written request should include the statistical analysis used to conclude that there may be a potential familial relationship between the suspected perpetrator and the offender.

2. Each request will be reviewed by the FBI's Office of the General Counsel and the NDIS Custodian for approval.

---

CODIS Help Desk Phone: 1-877-263-4743        CODIS Help Desk Internet Email: codishelp@saic.com
CODIS Help Desk Fax: 703-679-6960

# Exhibit D



## NATIONAL DISTRICT ATTORNEYS ASSOCIATION

THE RESEARCH, DEVELOPMENT AND TECHNICAL
ASSISTANCE ARM OF NDAA



**APRI·HOME | About APRI | Contact APRI**

Search | Site Map | Events | Education | Employment

DNA Home

DNA Case Law

DNA Events

DNA News

DNA Resources

Newsletter

Contact Us

Silent Witness - Volume 10, Number 2, 2006

## Catching Criminals by Investigating Profiles with Allelic Similarities

### DNA and Databanks

DNA has become a very powerful tool within the criminal justice system, not only to prosecute criminals, but to investigate or exonerate those suspected or convicted of criminal acts as well. The utilization of DNA as an identifier has had a profound impact on the justice system. The court in *California v. Robinson* asserted that DNA "...appears to be the best identifier of a person that we have."[1] The Combined DNA Indexing System (CODIS) has greatly enhanced the ability to use DNA evidence for identification. CODIS is computer software developed and distributed by the FBI, that allows laboratories to share and compare DNA profiles with each other. The software allows all uploaded DNA profiles to be searched not only against other known DNA offender profiles, but also against unidentified profiles from crime scene evidence, much in the way AFIS, Automated Fingerprint Identification Systems, searches for fingerprints. The FBI's national Convicted Offender databank currently holds approximately 3.4 million profiles and the Forensic Index contains about 145,000 profiles.[2] Databanks similar to the National DNA Indexing System (NDIS) in the United States are also maintained by foreign countries such as Great Britain and Australia.[3]

In addition to identifying DNA profiles that match exactly at all 26 alleles, CODIS can also identify profiles that are near-matches or profiles with allelic similarities. This article will discuss what a partial profile is, how it can assist in criminal investigations and challenges to the usage of partial profile matches.

### DNA Profiling

Traditionally, when a suspect's DNA profile is compared to a profile from a crime scene evidence sample, there are typically three possible outcomes. The profiles can "match" (if all 26 alleles are the same), the suspect profile can be "excluded" (if differences are observed), or there can be an "inconclusive" result, which means that for a variety of possible reasons, the offender profile being compared could not be included or excluded as the possible source of the crime scene sample.

A "partial match" is a "moderate stringency candidate match between two single source profiles *having at each locus at least one allele in common.* (emphasis added) A 'partial match' is **not** an exact match of two profiles customarily used to infer the identity of the perpetrator. A potential familial relationship may exist between the offender and the putative perpetrator".[4] It must be noted that not all close relatives will have one allele in common at every locus.

Partial match profiles can be used to catch criminals because there are allelic similarities among closely related individuals. Therefore, these allelic similarities could mean that the perpetrator of a crime is a sibling or close relative of the partial match profile identified in CODIS. For example, during the course of an investigation, a known suspect profile may be compared to an unknown crime scene evidence sample and no match is found. However, the profiles are determined to be significantly similar suggesting that the true perpetrator may in fact be a relative of the original suspect. This can serve as a useful investigative lead for law enforcement to follow.

Alternatively, an unknown evidence sample from a crime scene may be uploaded into CODIS, and when searched against the offender databank a near match profile is identified. An assumption can be drawn that the partial match profile identified could be closely related to the perpetrator of the crime. The partial match profile may provide investigators with a lead in a case that may have otherwise gone cold and/or identify or focus an investigation toward a potential suspect, thus allowing law enforcement agencies to conserve and streamline resources.

**Partial Matches to Catch Criminals**

Partial match profiles are controversial because a significant number of individuals might be subject to investigation merely on the basis of being related to a prison inmate. According to the U.S. Department of Justice, in 2002 46 percent of prison inmates had a family member who had been incarcerated.5

Until recently, the FBI did not release the personal information of partial matches. Unfortunately, in some instances, investigations stalled and cases went cold because these potential leads could not be investigated. Releasing the personal information of an individual associated with a partial match profile identified in a databank search has drawn debate at the national level. Consequently, in July 2006 the FBI issued an interim plan for release of partial match profiles and the ability to access the personal information of individuals identified through partial match profiles.

"The Interim Plan for the release of information to an NDIS Participating Laboratory is as follows:

1. With the documented concurrence of the prosecutor, the casework laboratory that identifies a 'partial match' shall provide the NDIS custodian with a written request for the release of the offender's identifying information. Such written request should include the statistical analysis used to conclude that there may be a potential familial relationship between the suspected perpetrator and the offender.

2. Each request will be reviewed by the FBI's Office of the General Counsel and the NDIS Custodian for approval ".6

The Interim Plan will apply to federal investigations and aid law enforcement in "situations where a crime has been committed in one state but the DNA of a potential relative is contained in another state's database7 ". "…(T)he FBI will allow state crime labs for the first time to tell investigators the names of people whose DNA partially matches that found on evidence at a crime scene…Police then would investigate the close relatives of the known offender8 ". The release of partial match information by SDIS for in-state investigations is regulated by the individual states. Currently, most state labs are not reporting partial matches, but the FBI's interim policy may prompt a change. "…(S)tate labs may opt not to report the match if state law or lab policy prevents them from doing so 9".

Nationally, the use of partial match profiles for investigative purposes is unsettled. Some states will allow partial match profiles to be generated, for example, New York and Massachusetts.10 But according to the State Police Databank Administrator for Massachusetts, although the technique is legal, the State Police are not using it because the manpower is not available.11 "California's DNA Database technicians report partial matches that 'appear useful' to law enforcement, but they do not actively search for relatives12 ". "In Virginia, lab examiners are permitted to tell investigators that a crime scene sample might have come from a family member when the DNA near-match is 'very very close13' ". Also, "(b)eginning this year, Florida's DNA database operators have permitted to give investigators the names of convicted offenders who match a crime scene sample at 21 of 26 alleles14 ". There are no clear or precise parameters as of yet.

North Carolina used this investigative technique successfully. A woman was raped and murdered in 1984, and Darryl Hunt was convicted and served 18 years in prison. The N.C. Bureau of Investigation performed post conviction testing on the crime scene evidence. The 13 loci STR profile developed from a crime scene sample exonerated Darryl Hunt, but the evidence profile did not match any of the 40,000 convicted offenders' profiles in the N.C. state

databank. The closest match found to the evidence sample was that of Anthony Denard Brown. Anthony Brown was excluded, but his DNA matched the crime scene sample at 16 out of a possible 26 alleles. This partial match led investigators to his brother, Willard Brown. Investigators typed Willard Brown's DNA from discarded cigarette butts and his DNA matched the crime scene evidence profile at all 26 alleles. He pled guilty to the 1984 rape and murder and was sentenced to life plus ten years in prison.15

### Familial Searches

Familial searching also provides investigative leads in unsolved crimes based upon partial matches. Familial searching is a technique whereby a crime scene profile is deliberately run through the offender databank in the hopes of getting a list of profiles that are genetically similar to the evidence and using this information as an investigative lead to interview family members of the near matches.

Familial searches are not done in the United States and at present, the FBI has no plans to adopt this technique. They are being performed in the United Kingdom and Wales through the Forensic Science Service (FSS)/Forensic Intelligence Bureau. These searches produce leads which are used in combination with a variety of other investigative techniques. In 2002, the searches were first applied by the FSS to a 1973 case in which three women were murdered in South Wales. A DNA profile taken from crime scene evidence was used for comparison. The National DNA Database (NDNAD) provided investigators with a familial match to Paul Kappen, which then led them to his father, Joseph Kappen. Joseph Kappen was identified as the rapist and murderer of the three women.

This technique was also used in Cardiff, Wales in 2003 to solve a 1988 murder of a 16 year old girl named Lynette White. Analysts identified a single rare allele within the DNA profile typed from the crime scene evidence. The U.K. National DNA Database searched for individuals with the identified rare allele and it led to a 14-year-old boy with a similar overall DNA profile. Further investigation led police to the boy's paternal uncle, Jeffrey Gafoor. Jeffrey Gafoor's DNA profile matched the profile from the crime scene evidence. He confessed and was later convicted of the murder of Lynette White.

### Defense Challenges to Partial Profiles Searches

A number of challenges to the investigative use of partial match profiles are beginning to surface. The following paragraphs illustrate some of the challenges currently being asserted.

#### Minority Groups and the Poor will be Targeted
Concerns have been raised that minority groups and the indigent will be unfairly targeted when looking at partial profiles because these groups are overrepresented in the convicted offender databanks.

When searching a DNA databank, the included profiles are all anonymous. DNA profiles are not identifiable by name, gender, race or any other identifiable traits or characteristics, therefore, no specific person or groups can be targeted. The profile is flagged as a near match solely on the basis of its allelic similarities to a forensic profile. The individual connected with the partial profile is anonymous, unless identifying information is otherwise requested and released.

#### Wasting Time and Resources
Opponents to this technique claim that law enforcement will waste time and resources following up on a variety of leads, many of which may be false and have no bearing on the case.

When investigating a crime, a variety of leads must be considered and pursued. Some will have merit and others will not. Dr. Fred Bieber, a geneticist at Harvard University and a leading proponent of the cautious application of partial matches for criminal investigative purposes, has said, "(n)ot investigating such leads would be like getting a partial license plate number on a getaway car and saying 'Well, you didn't get the whole plate so we're not going to investigate the crime16 ".

#### Genetic Surveillance

Another challenge to the use of partial match searches arises from concerns about of genetic surveillance of blood relatives of convicted offenders. By placing millions of ordinary law abiding citizens under "genetic surveillance," privacy activists believe this search technique places innocent individuals at the mercy of their blood line.

## Conclusion

The partial match profile has great investigative potential, but like any other investigative tool, it must be coupled with other relevant investigative techniques. A balance must be achieved between the protection and security of the community and the privacy rights of the individual. Using partial match profiles for investigative purposes is a technique which has only begun to surface and unfold.

## Endnotes

1 *People v. Robinson*, Sacramento Co. Sup. Ct. No. 00F06871; *Pending appeal, People v. Robinson, Case No. C044703, CA Third App. Dist.*

2 The approximate number of profiles held within the indexes are current as of June 2006. http://www.fbi.gov/hq/lab/codis/national.htm.

3 See The Forensic Science Service, http://www.forensic.gov.uk (used by police in England and Wales) (last visited: August 2006) and CrimTrac, National Criminal Investigation DNA Database, http://www.crimtrac.gov.au/dna.htm (service used by the Australian police department) (last visited: August 2006).

4 Interim Plan for Release of Information in the Event of a "Partial Match" at NDIS, CODIS Bulletin, July 20, 2006. *Full text of Bulletin is available at the end of the document.*

5 James, Doris, October 13, 2004, Profile of Jail Inmates, 2002, *Bureau of Justice Statistics Special Report*, NCJ 201932.

6 Interim Plan for Release of Information in the Event of a "Partial Match" at NDIS, CODIS Bulletin, July 20, 2006.

7 Michels, Scott, July 20, 2006, FBI approves using DNA to find suspects' relatives, *U.S. News and World Report*, www.usnews.com.

8 Id.

9 Id.

10 N.Y. Comp. Codes R. & Regs. 9 §6192.3 & Mass. Regs. Code 515 §2.14.

11 Cook, Gareth, May 12, 2006, Near Match of DNA Could Lead Police to More Suspects, Boston Globe, http://www.boston.com/news/nation.

12 Id.

13 Id.

14 Id.

15 Richard Willing, *Suspects Get Snared by a Relative's DNA*, USA Today, June 8, 2005 at 1A.

16 Weiss, Rick, Vast DNA Bank Pits Policing vs. Privacy, *Washingtonpost.com*, June 3, 2006.

DOWNLOAD CODIS Bulletin - *Interim Plan for the Release of Information in the Event of a "Partial Match" at NDIS.*

**NDAA's American Prosecutors Research Institute**
99 Canal Center Plaza, Suite 510, Alexandria, VA 22314

Legal Disclaimer

Copyright © 2008 by NDAA
All Rights Reserved