UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARTIN BOROIAN,           )
      Plaintiff,           )
v.                        )    CIVIL ACTION NO. 05-11373-GAO
ROBERT MUELLER, III, *et al.*,  )
      Defendants.          )

## **DEFENDANTS' MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS**

The Defendants, Robert Mueller, III, Carmen Wallace and the United States Probation Department, by and through their attorney, Michael J. Sullivan, United States Attorney, submit this memorandum in support of their motion to dismiss.

## **FACTS**

Martin Boroian ("Boroian") was convicted in the United States District Court for the District of Vermont of the offense of making a false statement in violation of 18 U.S.C. §1001(a)(2) and was sentenced to one year of probation. Am. Comp. [D. 23], ¶ 6. On June 30, 2005, Boroian submitted to DNA testing in accord with the requirements of the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), 42 U.S.C. §§ 14135-14135e.[1] Id., ¶ 9. Boroian's probationary term expired in July 2005. Id., ¶ 7.

Boroian contends that the continued detention of his DNA profile and DNA sample, after the conclusion of his probationary period, violates the Fourth Amendment, and thus, is unconstitutional. Id., ¶ 14. As a result, Boroian seeks an Order compelling the destruction of the sample and to expunge his DNA profile from the DNA database. Id., p. 5 ("Prayer for Relief").

Boroian fails to state a claim upon which relief may be granted under the Fourth Amendment because: (1) no new "search" occurs when the government accesses a database

---

[1] The DNA Act was subsequently amended to, among other things, broaden the scope of crimes subject to its requirements. See United States v. Kincade, 379 F.3d 813, 816 n.1 (9th Cir. 2004) (*en banc*), cert. denied, 544 U.S. 924 (2005) (reviewing the Act's subsequent history). For simplicity, this brief refers to the provisions as amended collectively as the "DNA Act."

containing a record of a lawfully obtained analysis; and (2) assuming that accessing the CODIS database implicates Fourth Amendment protections, the government's compelling interest in Boroian's identity as a convicted felon, the substantial governmental interest in solving future crimes, and the substantial governmental interest in exonerating innocent individuals, outweighs any minimal privacy interest that Boroian, a convicted felon, may possess in a record of his identity.

## ARGUMENT

**I.    Background**

    **A.    Collection of DNA Samples, the Creation of DNA Profiles, and CODIS**

The DNA Act authorizes federal authorities to collect a "DNA sample" from individuals who have been convicted of certain federal crimes and are currently incarcerated or on parole, probation, or supervised release. 42 U.S.C. §§14135a(a)(1)-(2).[2] A "DNA sample" is "tissue, fluid, or other bodily sample . . . on which a[n] . . . analysis of th[at person's] deoxyribonucleic acid (DNA) identification information" can be performed. Id. at §§14135a(c)(1)-(2).[3]

The Federal Bureau of Investigation ("FBI") uses the sample to create a DNA profile, based on information contained at specified locations in the person's DNA. Weikert, 504 F.3d at 3-4. The "DNA profile" is created using what is termed "junk DNA." That is, DNA "that differs from one individual to the next and thus can be used for purposes of identification but which was

---

[2] The 2004 amendments to the DNA Act provide, *inter alia*, that "[a]ny felony" constitutes a qualifying federal offense. 42 U.S.C. § 14135a(d)(1).

[3] The Act permits the government to "use or authorize the use of such means as are reasonably necessary" to collect a DNA sample. 42 U.S.C. §14135a(a)(4)(A). The Act makes refusal to cooperate in the collection of a DNA sample punishable as a class A misdemeanor. Id. at §14135a(a)(5). The Act also requires courts imposing terms of supervised release or probation to include cooperation in providing a DNA sample "an explicit condition" of such term of conditional release. 18 U.S.C. §3563(a)(9)(probation), §3583(d)(supervised release).

'purposely selected because [it is] not associated with any known physical or medical characteristics' and 'do[es] not control or influence the expression of any trait.'" Weikert, 504 F.3d at 3-4 (*quoting* H.R. Rep. No. 106-900I, at 27 (2000)).

The record of this analysis, a "DNA profile," is then entered into the Combined DNA Index System ("CODIS"), a large database used to compare DNA profiles of offenders with profiles created from evidence obtained elsewhere, such as crime scene evidence. Id.; see also 42 U.S.C. §14132(a-b).[4] Disclosure of a "match" to a stored DNA profile is permitted:

> (A) to criminal justice agencies for law enforcement identification purposes;
> (B) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules; and
> (C) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged.

42 U.S.C. § 14133(b)(1).[5]

The Act prohibits unauthorized disclosures or improper use of the information, imposing penalties of up to one year in prison and a fine of as much as $250,000. 42 U.S.C. § 14135e(c).[6]

### B.    The First Circuit's Decision In Weikert

In United States v. Weikert, 504 F.3d 1 (1st Cir. 2007), the First Circuit held that the provisions of the Act authorizing collection of DNA samples from convicted felons on

---

[4] See also, e.g., United States v. Sczubelek, 402 F.3d 175, 181 (3rd Cir. 2005), cert. denied, 126 S.Ct. 2930 (2006) ("CODIS allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system") (quotation omitted).

[5] In addition, the statute allows disclosure "if personally identifiable information is removed," for a population statistics database, research and development of identification methods, and quality control purposes. 42 U.S.C. § 14133(b)(2).

[6] The DNA Act also provides for the expungement of an individual's DNA information if the felony conviction is reversed or dismissed. 42 U.S.C. § 14132(d).

supervised release and the creation of DNA profiles for use in the CODIS database did not violate the Fourth Amendment. Id. at 18. The Court began by holding that the totality of the circumstances balancing test, rather than the special needs test, provided the proper framework for addressing whether the collection of DNA samples in that context violates the Fourth Amendment. Id. at 9-10. Applying that test, the Court found that DNA collection from individuals on supervised release was supported by a number of "important interests" of the government, including "monitoring and rehabilitating supervised releasees, solving crimes, and exonerating innocent individuals." Id. at 13-14.

The Court further found that the government's interests outweighed the "substantially diminished expectation of privacy" enjoyed by individuals on supervised release. Id. at 11-13. In doing so, the Court held that the initial drawing of blood to be used to create a DNA sample was "neither a significant nor unusual intrusion." Id. at 12.

The Court also rejected the argument that analyzing a defendant's DNA, creating a DNA profile, and entering that profile into CODIS for purposes of identification implicated "unique privacy considerations." Id. at 12-13. In this regard, the Court found significant that the law imposes significant penalties for the improper disclosure of DNA information. Id. *(*citing 42 U.S.C. §14135e(c)). The Court also accepted, for purposes of its analysis, that the government would continue its current practice of using "junk" DNA to create the DNA profiles in CODIS. Id. [7]

In upholding DNA collection in Weikert, the First Circuit joined the unanimous view of

---

[7]But see 504 F.3d at 13 n.10 (noting that the current practice of using "junk" DNA is not mandated by statute or regulation). The Court noted the possibility that current assumptions about "junk" DNA may change and that "a reconsideration of the reasonableness balance" could be required in a future case, upon an appropriate record. Id. at 12-13, and 13 n.10.

the courts of appeals rejecting Fourth Amendment challenges to the DNA Act and various state analogues. See Banks v. United States, 490 F.3d 1178, 1193 (10th Cir. 2007) (federal DNA Act);[8] United States v. Amerson, 483 F.3d 73, 89 (2nd Cir. 2007), cert. denied, United States v. Amerson, 128 S.Ct. 646 (2007) (federal DNA Act); United States v. Hook, 471 F.3d 766, 773 (7th Cir. 2006) (federal DNA Act); United States v. Conley, 453 F.3d 674, 680 (6th Cir. 2006) (federal DNA Act); United States v. Kraklio, 451 F.3d 922, 924-25 (8th Cir. 2006) (federal DNA Act); Johnson v. Quander, 440 F.3d 489, 497 (D.C. Cir. 2006), cert. denied, 127 S.Ct. 103 (2006) (federal DNA Act); Sczubelek, 402 F.3d at 187 (federal DNA Act); Padgett v. Donald, 401 F.3d 1273, 1280 (11th Cir. 2005) (Georgia analog); Kincade, 379 F.3d at 839 (federal DNA Act); Groceman v. United States Dept. of Justice, 354 F.3d 411, 413-14 (5th Cir. 2004) (per curiam) (federal DNA Act); Jones v. Murray, 962 F.2d 302, 308 (4th Cir. 1992) (Virginia analog).

Although the First Circuit upheld the collection of DNA samples and the creation of DNA profiles and their entry into CODIS, the court expressly declined to reach the question

---

[8] Although Banks was issued after Weikert, the Tenth Circuit had upheld DNA collection in another case prior to the First Circuit's decision in Weikert. See United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir. 2003)(upholding requirement of Act that defendant provide DNA sample as condition of supervised release as "a reasonable search and seizure" under the Fourth Amendment).

whether the government could retain DNA evidence after the conclusion of supervised release.

> We do not resolve the question of whether it is also constitutional to retain the DNA profile in the database after . . .[an individual] is no longer on supervised release.  Mindful of the well-established principle that constitutional cases should be decided as narrowly as possible and the rapid pace of technological development in the area of DNA analysis, we reserve judgment on that issue for another day.

Weikert, 504 F.3d at 3.

**II.    No "Search" Is Conducted By The Accessing Of The CODIS Database Which Contains Only A Record Of The Result Of A Lawfully Conducted Analysis**

Boroian contends that the continued detention of his DNA sample and the analysis of that sample contained in the CODIS database warrants Fourth Amendment analysis under the totality of the circumstances test set forth in Samson v. California, 126 S.Ct. 2193 (2006).  Boroian argues that he has completed his term of probation (thereby re-acquiring, for Fourth Amendment purposes, the status of an ordinary citizen), and, that in light of the substantial privacy interests potentially implicated by DNA analysis, his privacy interests now outweigh any government interest in the retention of his DNA sample and the analysis of that sample contained in CODIS.  Thus, concludes Boroian, the continued detention of his DNA sample and the use of his "DNA profile" in CODIS violate the Fourth Amendment.  Boroian's argument is misplaced.

**A.    No Search Occurs As A Result Of The Retention Of Boroian's DNA Profile In CODIS**

The Fourth Amendment guarantees that the people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

> [W]here . . . the Government seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant at several levels.  The initial detention necessary to procure the evidence may be a seizure of the person, if the detention amounts to a meaningful interference with his freedom of movement.  Obtaining and examining the evidence may also be a search, if doing so infringes an

6

expectation of privacy that society is prepared to recognize as reasonable. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616 (1989).

Unquestionably, a search occurred when the government obtained the DNA sample from Boroian. Weikert, 504 F.3d at 6 ("the *extraction* of blood for DNA profiling constitutes a search within the meaning of the Fourth Amendment") (emphasis added). Further, the scientific analysis and creation of the DNA profile implicated recognized privacy interests, and thus warranted Fourth Amendment analysis. Skinner, 489 U.S. at 616.

As regards this case, however, that "search" is complete. And, equally clear, that "search" was proper under the Fourth Amendment. Weikert, 504 F.3d at 15 ("we conclude that neither the blood draw nor the subsequent creation of a DNA profile and the entry of that profile into CODIS constitutes an unreasonable search or seizure in violation of the Fourth Amendment.").

In light of the fact that a "search" is required to trigger Fourth Amendment protections, Boroian's argument neatly sidesteps the initial question presented in this matter, namely, whether any *now actionable* "search" can be found to have occurred. In this regard, the present claim is clearly different from the question presented in Weikert. The government neither seeks to extract a DNA sample, nor to conduct any analysis thereof, it simply seeks to retain the analytical results (lawfully obtained) for future review in CODIS. Compare, Skinner, supra.

Boroian appears to contend that the retention of the "DNA profile" in the CODIS database constitutes a "search," and, implicitly, that each use of the CODIS database constitutes a "search." See Pl. Memo. [D. 24], p. 6-8. Skinner's language, however, dictates that Fourth Amendment analysis may be triggered by "obtaining and examining" the DNA sample, an event

7

which does not occur when the CODIS database is accessed. Accessing the CODIS database is a search of a record retained of that analysis (an analysis that is not re-performed each time CODIS is accessed).

The present circumstance, thus, is vastly different from the question presented in Weikert. Accordingly, it is of primary importance to note that what Boroian now challenges is the ability of the government to retain and use *a record* of a lawfully conducted analysis of a lawfully obtained sample. That is to say, in addition to the two levels of analysis heretofore recognized as requiring Fourth Amendment scrutiny – here, the extraction of the DNA sample and its analysis[9] – Boroian would add a third level, requiring a balance of competing interests *every single time* the government seeks to put to use a lawfully obtained record.

No "search" occurs, however, as a result of the government's use of such a record. See Wilson v. Collins, 517 F.3d 421, 428 (6th Cir. 2008) (claims based upon "the indefinite retention of . . .[a] DNA sample and DNA information, as well as the sharing of . . . [a] DNA profile through the state and national DNA-indexing systems . . . do[] not implicate the Fourth Amendment"); Amerson, 483 F.3d at 86 ("We acknowledge that the DNA profile of appellants will be stored in CODIS, and potentially used to identify them, long after their status as probationers . . . has ended. But we do not believe that this changes the ultimate analysis. . . . In particular, it is well established that the state need not destroy records of identification-such as fingerprints, photographs, etc.-of convicted felons, once their sentences are up"); Johnson, 440 F.3d at 498 ("accessing the records stored in the CODIS database is not a 'search' for Fourth

---

[9] See United States v. Dionisio, 410 U.S. 1, 8 (1973) ("the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels - the 'seizure' of the 'person' necessary to bring him into contact with government agents, and the subsequent search for and seizure of the evidence.") (citation omitted).

8

Amendment purposes")(citing Arizona v. Hicks, 480 U.S. 321 (1987)); and Conley, 453 F.3d at 680 (rejecting claim that DNA information in CODIS is "subject to repeated search" because DNA profile is merely a "record" without an accompanying right of privacy) (citing Kincade, 379 F.3d at 837)).[10] As explained by the Circuit Court for the District of Columbia:

> a felon's DNA fingerprint is more akin to a snapshot: It reveals identifying information based on a blood test conducted at a single point in time. Of course, even snapshots can raise Fourth Amendment concerns. However, if a snapshot is taken in conformance with the Fourth Amendment, the government's storage and use of it does not give rise to an independent Fourth Amendment claim.

Johnson, 440 F.3d at 499 (citations omitted). See also Weikert, 504 F.3d at 4 (noting that the CODIS profile is "a kind of genetic fingerprint, which uniquely identifies an individual, but does not provide a basis for determining or inferring anything else about the person"); Amerson, 483 F.3d at 85 (same).[11]

Because no "search" occurs as a result of the storage and use of Boroian's DNA profile in the CODIS database, the Complaint fails to state a claim upon which relief may be granted under the Fourth Amendment with respect to Boroian's DNA profile.

### III. Assuming That The Retention Of The DNA Profile Implicates Fourth Amendment Analysis, Boroian Possesses Only A Minimal Privacy Interest In A DNA Profile Which Reveals Only His Identity And Any Such Interest Is Outweighed By Substantial Government Interests

Assuming, nonetheless, that the accessing of the CODIS database would implicate protected Fourth Amendment interests (it does not), Boroian argues that his privacy interests outweigh the government's interest in retaining and using such information. See Pl. Memo. [D.

---

[10] See also, Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring) ("the fourth amendment does not control how properly collected information is deployed. Use of DNA is in this respect no different from use of a fingerprint; only the method of obtaining the information differs . . .").

[11] But see, contra, Kinkade, 379 at 867 (Reinhardt, J., dissenting).

24], p. 5; Weikert, 504 F.3d at 10-11. As demonstrated below, the government's substantial interests in the retention and use of the DNA profiles in CODIS far outweigh any minimal privacy interest Boroian may possess in a record of his identity, and, the completion of the term of Boroian's probation does not significantly diminish the government's interests.

    **A.    The Government Possesses A Substantial Interest In The Identity Of Convicted Felons, And The DNA Profiles In CODIS Serve The Substantial Government Interests In Solving Future Crimes And Exonerating Innocent Individuals**

In Weikert, the First Circuit concluded that the government has "important interests in monitoring and rehabilitating supervised releasees, solving crimes, and exonerating innocent individuals" through use of the CODIS database. Weikert, 504 F.3d at 13. The present case presents the question of what, if any, effect the completion of the term of Boroian's probation should be deemed to have upon the balancing of interests. That is to say, as Boroian has completed his term of probation, the government may not rely upon any interest in "the need to identify, monitor, and rehabilitate individuals on supervised release [or probation]." Weikert, 504 F.3d at 13. Nevertheless, the government retains substantial interests in the retention of DNA profiles, interests which are not dependent upon Boroian's status as a probationer.

The collection of DNA samples for entry into CODIS serves the government's interest in solving past and future crimes and, no less important, exonerating those who might otherwise be wrongly suspected of criminal activity. Weikert, 504 F.3d at 14 (noting that DNA collection has not only aided 50,000 investigations around the country, but has also served to exonerate many individuals who might otherwise have been suspected); Amerson, 483 F.3d at 87-88 (explaining, in evaluating the interests served by DNA testing, that the use of crime scene DNA to accurately identify suspects serves to "prevent[] innocent individuals . . . from even becoming potential

suspects," thus "protect[ing] large numbers of people from having to suffer one of the central indignities with which the Fourth Amendment has historically been concerned – being made a suspect for a crime one did not commit"); see also Banks, 490 F.3d at 1188-89 (reasoning that the more comprehensive the DNA database is, the more likely that it will provide information that incorrectly targeted individuals can use to exonerate themselves).[12]

### B.  Boroian, As A Convicted Felon, Possesses No Recognized Privacy Interest In A Record Of His Identity

Unlike the situation in Weikert, the government does not seek to extract any DNA sample, or conduct any analysis of that sample. Thus, Boroian can claim no privacy interest in this case with respect to either. See also, Section II, supra. At issue, then, exclusively, is what privacy interest Boroian may have in the future use of the results of an analysis, lawfully conducted, of a sample of DNA which was itself lawfully obtained.

The DNA profile maintained in CODIS is derived from "junk DNA." Weikert, 504 F.3d at 3-4. Such a DNA profile, which provides information only of the individual's identity, is a minimal intrusion equivalent to a fingerprint or snapshot record. Conley, 453 F.3d at 680 (agreeing that a DNA profile created "*only* a record of the defendant's identity–otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of the qualifying offense") (emphasis in original) (quotation omitted); Kincade, 379 F.3d at 837 (same); Johnson, 440 F.3d at 499 (same); Weikert, 504 F.3d at 4 (same); Amerson, 483 F.3d at 85 (same). The retention of a record of a convicted felon's identity (albeit a highly accurate one) simply does not implicate a recognized privacy interest (and certainly not a

---

[12] Arguments for access to DNA evidence for the purpose of challenging convictions have been successfully pressed. See McKithen v. Brown, --- F.Supp.2d ----, 2008 WL 2791852 (E.D.N.Y. 2008). See also, 42 U.S.C. § 14133(b)(1)(C).

significant one).[13]

### C. Balancing Of The Competing Interests

The government's substantial interests in solving crimes and exonerating innocent individuals are independent of Boroian's probationary status and, thus, are not diminished by the completion of his term of supervised release. Nor has Boroian's privacy interest, at least with respect to the information contained in the CODIS database, increased by virtue of his completing his probationary term.

To be sure, the First Circuit recognized that, "[t]he distinction in status between a current and a former offender clearly translates to a change in the privacy interests at stake." Weikert, 504 F.3d at 16. But the context of Weikert is important. That case involved the extraction and analysis of a bodily sample, and the court recognized that a current offender clearly has less expectation of privacy in the extraction and analysis of such evidence as compared to one who has completed all aspects of his sentence. Id. at 15-18. Here, in contrast, where the alleged "search" consists of retention and use of analytical results previously obtained by lawful means,[14] it is far from clear that a former offender has any greater expectation of privacy than does a current offender. Virtually all citizens today understand that identification information previously obtained by lawful means may be accessible for certain law enforcement purposes via

---

[13]Boroian seeks to undercut the undisputed substantial government interest in the identity of convicted felons by arguing that the routine retention of fingerprints occurred in the absence of modern Fourth Amendment jurisprudence, and, as a consequence "society has become accustomed to the idea of fingerprints being stored in a government database." See Pl. Memo. [D. 24], p. 20. n.23. It is difficult to conceive of what such an observation adds to the question before this Court. If, as is clearly the case, society recognizes a substantial government interest in the identity of convicted felons, no rational basis exists to deny law enforcement the use of advances in technology to pursue that substantial interest, especially, where, as here, the record in question is merely a form of identification evidence.

[14]As shown previously, such retention and use does not constitute a "search."

electronic means.

Moreover, unlike an ordinary citizen, Boroian is a convicted felon, and that status alone grants the government a compelling interest in his identity. And, as that interest arises from the fact of conviction, it is not diminished (and certainly not substantially diminished) by the completion of Boroian's probationary term. Banks, 490 F.3d at 1188 ("It is well settled that once an individual has been convicted, his or her identity becomes a matter of compelling interest to the government . . . and the individual can no longer assert a privacy interest in certain marks of identification") (quotation omitted); Amerson, 483 F.3d at 87 ("the government has a 'strong,' even 'compelling' and 'monumental,' interest in obtaining and storing accurate identifying information from convicted offenders"); Green, 354 F.3d at 679-81 (Easterbrook, J., concurring) (" Established criminality may be the basis of legal obligations that differ from those of the general population . . . . Collecting felons' DNA, like collecting their fingerprints, handwriting exemplars, and other information that may help solve future crimes (and thus improve the deterrent force of the criminal sanction) is rationally related to the criminal conviction."); Kinkade, 379 F.3d at 837 (same); and Sczubelek, 402 F.3d at 184 (same).[15]

To the extent Boroian seeks to undercut the government interests at stake by claiming that he is not likely to re-offend, or that his particular crime is not one in which DNA analysis would prove useful, such claims are without substantial force. As the Second Circuit recently stated in rejecting a similar argument:

> To consider the government's interests in DNA testing solely in terms of DNA's capacity to dissuade or to make more easily solvable the crimes that the particular felons being tested might commit in the future is to miss the breadth of the

---

[15] See also, generally, McKune v. Lile, 536 U.S. 24, 36 (2002) ("A broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions . . . of those who have suffered a lawful conviction").

> government's proper interest in DNA testing.  That interest is, emphatically, not limited to the specific deterrence to the particular offender . . . .  Rather, it reflects the whole panoply of societal benefits that stem from the capacity to identify or exclude individuals quickly, accurately and at reasonable expense . . . .   Viewed in this light, the government's interest in getting appellants' DNA samples is not much attenuated by the fact that appellants are non-violent felons.

Amerson, 483 F.3d at 89.  See also Banks, 490 F.3d at 1191 ("non-violent offenders have higher recidivism rates than the general population").

Moreover, subsequent to Weikert, the First Circuit has expressly rejected claims by individuals (on supervised release) who argued that the government's interests in their DNA profiles was diminished by the nature of their offenses and/or by the fact that DNA evidence was unlikely to be useful in solving crimes like those for which the individuals had been convicted.  As regards any claim that DNA evidence is unlikely to prove useful because of the nature of Boroian's offense, the First Circuit held, "[t]his argument rests on the flawed assumption that DNA evidence is only useful for solving – and thereby for deterring – violent crimes."[16] United States v. Stewart, — F.3d —, 2008 WL 2638830, * 2 (1st Cir. 2008).

And, as regards claims that the government's interest should be parsed based upon the nature of the offense, "attention to the nature of an individual conditional releasee's crime would detract from what we considered, in Weikert, to be a virtue of the DNA Act: that it applies uniformly to all felons and therefore 'the importance of the government's interests is not diluted by the possibility of selective enforcement or harassment.'"  Stewart, 2008 WL 2638830, at *2

---

[16] See also, Banks, 490 F.3d at 1189-90 (discussing studies and reports indicating that identifiable amounts of DNA can be extracted from hair and found on doorknobs and coffee cups and noting that this means that DNA has a utility outside the realm of violent crime, and, pointing to statistics showing that many individuals convicted of non-violent offenses later commit crimes, including violent crimes, "that DNA might help solve").

(quoting Weikert, 504 F.3d at 14).[17]

There is no reason why such reasoning would not apply to, and foreclose, Boroian's claims in this regard.

> D. **Boroian's Claims Of Potential Advances In DNA Technology And Potential Abuse Of DNA Information Do Not Substantially Increase The Privacy Interests At Stake**

As discussed below, Courts, including the First Circuit, have recognized the potential for either more substantial privacy interests as result of advances in DNA technology, or, for increased privacy interests based upon potential abuses of DNA information. Yet no court has recognized an increased privacy interest based merely upon such possibilities. And, as regards the significance of such claims in this case, the fact that Boroian has completed his term of probation does not render scientific advances or abuse of the DNA information more likely. Neither the possibility of future advances in DNA technology nor the possibility of future abuse, substantially increases any privacy interest held by Boroian.

> 1. No Evidence Exists That The DNA Profile In CODIS Reveals Personal Information About Boroian

Boroian does not allege or contend that his DNA profile presently reveals any personal information about him. See Pl. Memo. [D. 24], p. 16 ("the genes at the thirteen CODIS loci themselves have not yet been found to cause any physical traits or diseases"). Instead, Boroian cites to scientific studies and news articles[18] which suggest that our understanding of "junk

---

[17]"This lack of discretion removes a significant reason for warrants-to provide a check on the arbitrary use of government power." Amerson, 483 F.3d at 82.

[18]Whether these attached studies and news articles constitute "well pleaded facts" which the government must presume to be true for purposes of this motion is questionable. It is certainly clear that they do not constitute competent evidence. Nonetheless, for purposes of this motion, the government will presume that the studies and news articles are evidence that our understanding of DNA is incomplete and the possibility exists that at some point in the future the possibility exists that advances in DNA research, at

DNA" is incomplete and that such "junk DNA" may, at some point in the future, be found to play some unspecified and unknown role in the development of personal traits and characteristics. [D. 24, Exhibits 2-4 and D. 26, Exhibits 1-3].

At best, such materials suggest that it is possible that "junk DNA" may play some as yet unspecified, and as yet unknown, role in the development of an individual's traits and characteristics.  See Pl. Memo. [D. 24], p. 16 (noting that such markers "may" later be found to be "useful" in tracking diseases because of correlations between such "junk DNA" and disease causing genes).  The materials cited do not identify what that role may be, nor even identify any time frame in which such possible advances can be expected to occur.

Unquestionably, the First Circuit declined to rule on the issue now presented, noting that "the ongoing evolution in our understanding of DNA warrants particular caution in determining what is constitutionally permissible . . . [because] profiles created have the potential to reveal information about an individual's health, propensity for certain diseases, and perhaps, sexual orientation and propensity for certain conduct."  Weikert, 504 F.3d at 16.  Nevertheless, as regards Boroian's claim, Weikert's analysis of this issue is instructive (and should be, for this Court, dispositive).

While noting the concerns raised by potential advances, the First Circuit concluded "the "possibility that junk DNA may not be junk DNA some day . . . does not significantly augment . . . [an individual's] privacy interest. . . [unless it could be shown that] the uses to which 'junk

---

some unspecified time, may reveal some as yet unspecified role for "junk DNA."  But see also generally, e.g., Colin Nickerson, DNA Unraveled - 'Scientific Revolution' Underway in Genomic Jungle, Boston Globe, Sept. 24, 2007, at C1 (reporting that new discoveries regarding junk DNA have been "more disorienting than illuminating"); Erik Parens, Op-Ed, Making Cells Like Computers, Boston Globe, Feb. 18, 2008, at A11 (noting scientists "are *just beginning* to understand" the potential importance of "junk" DNA) (emphasis added).

DNA' can be put . . . [are] significantly greater than the record before us today suggests."  Id. at 13.  Boroian's present claims regarding the possibilities of "junk DNA" are no more substantial than those pressed in Weikert.  That science may find some role for "junk DNA" remains a mere possibility, one whose occurrence is not only an unspecified distance in the future, but whose eventual occurrence is wholly uncertain.

As regards such a claim,[19] "court[s] must deal with the case in hand, and not with imaginary ones."  Yazoo & Miss. Valley R.R. v. Jackson Vinegar Co., 226 U.S. 217, 219-20 (1912).  Stated differently, this Court cannot rule upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."  City of Fall River, Mass. v. F.E.R.C., 507 F.3d 1, 6 -7 (1st Cir. 2007) (quotations omitted).  As the First Circuit noted in Weikert, the Fourth Amendment balancing analysis "focuses on present circumstances."  Weikert, 504 F.3d at 13; see also, Kincade, 379 F.3d at 838 (noting that, in reviewing a Fourth Amendment challenge to DNA collection, "[the court's] job is limited to resolving the constitutionality of the program before [the court], as it is designed and as it has been implemented").

It may well be, as noted by the First Circuit, that advances in DNA analysis will reveal uses for "junk DNA" which are not presently apparent.[20]  But, for purpose of this claim, this

---

[19]The Fourth Amendment implications of a program designed to cull DNA for other types of information, or one that lacks current legal safeguards, is simply not before this Court.  See Kincade, 379 F.3d at 838 (noting that courts "base decisions not on dramatic Hollywood fantasies . . . but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an accessible record"); Banks, 490 F.3d at 1192-1193 (recognizing potential abuses but declining to alter its analysis based on a "non-existent parade of horribles sanctioned by a hypothetical law"); Amerson, 483 F.3d at 86-87 (same); Johnson, 440 F.3d at 499 (same).

[20]It is equally potentially possible that "junk DNA" will remain "junk" and that whatever role "junk DNA" may be found to play is minor, insignificant, or, non-existent.  Further, even if some (now described) "junk DNA" is found to play a critical role in highly personal traits and characteristics, it is wholly speculative to assume that such discoveries will necessarily implicate the "junk DNA" utilized in the formulation of DNA profiles.

Court cannot evaluate the privacy invasion that may, at some point in the future, accompany wholly speculative and uncertain potential developments in DNA research. Nor can this Court balance such wholly speculative and uncertain interests against government interests in the use of DNA profiles (or, for that matter, against any wholly speculative *government interest* which might, itself, also be revealed by future scientific advances). There is no reason why the First Circuit's analysis of this issue in Weikert should not be dispositive, the fact that Boroian has completed the term of his probation does not make future potential advances more likely.

In sum, there is no evidence that the "junk DNA" used to compile the DNA profiles utilized in CODIS can reveal anything beyond the identity of the individual. As such, whatever analysis applies, this Court should not, and cannot, balance speculative and unknown privacy interests, or speculative abuses which have not been shown to have occurred, against the interests of the government.

The same reasoning applies to Boroian's claims of the possible use of the CODIS database for "partial match" results. In this regard, Boroian contends that an enhanced privacy interest should be recognized because his DNA profile could reveal a "partial match" to crime scene evidence, and thereby implicate a familial relative[21] in criminal activity. See Pl. Memo. [D.24], p. 17.[22] Such use of the DNA database is not presently occurring. See Pl. Memo. [D.

---

[21]The problems that accompany any attempt to assess a hypothetical program do not require illustration. But, digressing briefly, it is far from clear that Boroian may assert privacy interests of others, such as family members. Or, conversely, that family members could assert a privacy interest as to a "search" of Boroian, *i.e.*, the extraction and analysis of Boroian's DNA. See, e.g., Rakas v. Illinois, 439 U.S. 128, 133-134 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted").

[22]In withholding any decision on the issue now presented, the First Circuit expressly noted that one factor cautioning against a decision of the issue now presented is the fact that DNA profiles "may [also] reveal information about profiled individuals' family members." Weikert, 504 F.3d at 16.

24], p. 17-18 (noting that regulations prohibit "partial match" releases and only that some in law enforcement had advocated for such release).

Even assuming that the release of "partial match" results is presently being contemplated, whether such will actually occur remains uncertain. And, assuming that some program for the release of "partial match" information were to be implemented, left to be established are the parameters which may exist for any such release. This Court is in no position to evaluate the government interests or privacy interests at stake without knowledge of, for example, the circumstances in which a "partial match" will be released, the purposes for which such release would be authorized, and what, if any, controls would govern such a release.

That such use is contemplated does not substantially increase any privacy interest of Boroian where it is far from certain such will occur, and, even assuming it will occur, where nothing is known about the purposes for which, and the circumstances under which, such release would occur. See supra.

    2.  Boroian Does Not Possess Any Increased Privacy Interest Based Upon The Government's Retention Of His DNA Sample

To the extent that Boroian challenges the retention of his DNA sample, he points to no "search" of this material that is occurring or even imminent. Again, the First Circuit's analysis of such claims in Weikert is instructive. As regards claims of potential misuse of DNA samples, the First Circuit noted concerns that "the government might disregard its current stated procedure of using only the specified section of junk DNA to create an identifying profile, and might instead examine other sections of . . . [an individual's] DNA to extract personal information." Weikert, 504 F.3d at 12-13. The court nonetheless declined to afford great weight to such argument, concluding that because improper use of a DNA sample was

punishable by up to one year of incarceration, "the potential for unauthorized access to personal information, in violation of the explicit terms of the DNA Act, does not significantly increase . . . [an individual's] privacy interest . . . ." Id. at 13; see also, Stewart, 2008 WL 2638830, at *3. Other courts to have reviewed such claims have reached a similar conclusion.[23]

The mere fact that Boroian has completed his probationary term cannot alter this analysis. That is to say, the mere fact that Boroian has completed his term of probation does not render any misuse of the DNA information more likely, and, in the absence of demonstrated misuse of the DNA samples, Borian cannot claim any significantly increased privacy interest on this basis. Weikert, 504 F.3d at 14.

## CONCLUSION

Because no "search" occurs when the government accesses a database containing records of lawfully conducted analyses, and because substantial government interests outweigh any minimal privacy interest that Boroian, a convicted felon, may possess in a record of his identity, the Complaint must be dismissed for failure to state a claim upon which relief may be granted.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Mark J. Grady
Mark J. Grady
Assistant U.S. Attorney
John Joseph Moakley Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
617-748-3136

---

[23] See, e.g., Banks, 490 F.3d at 1192; Amerson, 483 F.3d at 87; Johnson, 440 F.3d at 499.